## Capital City Cab Service Inc. v.
## Susquehanna Area Regional Airport Authority

C.P. of Dauphin County, no. 34 EQ 2004.

*Peter J. Foster,* for plaintiff.
*J. Bruce Walter,* for defendant SARAA.
*Pankiw Bohdan,* for the Public Utility Commission.

CLARK JR., *J.,* November 8, 2004—

## INTRODUCTION

This equity action came before this court when a "petition for a preliminary injunction" and a "declaratory judgment complaint and petition for preliminary and permanent injunctions," were filed by the plaintiff, Capital City Cab Service Inc., against the defendant, Susquehanna Area Regional Airport Authority (SARAA). As a result of that petition, a pre-hearing conference was held on June 9, 2004 with this court, which conference included representatives of both parties and their respective legal counsels, together with a representative from the chief counsel's office of the Pennsylvania Public

Utility Commission (PUC). A hearing was subsequently held before this court on June 10, 2004. Shortly after that hearing (on June 10, 2004), we issued an interim decree (on June 14, 2004) that was to remain in effect pending the further resolution of the underlying issue(s) which we determined were within the primary jurisdiction of the PUC. SARAA took exception to portions of our interim decree and filed an appeal in the Commonwealth Court. This writing is being undertaken to provide the Commonwealth Court with the basis, scope and intent of our limited relief in the form of the interim decree.

## HISTORICAL BACKGROUND

As early as 1898, a portion of the premises now known as Harrisburg International Airport (HIA) was being utilized by the Signal Corps of the United States Army for governmental purposes. After the invention of the airplane, those same premises came to be known as Middletown Field. In or about 1918, the first military airplanes were reported to have landed at Middletown Field. At some point thereafter, the premises were renamed as the Olmsted Air Force Base. At the height of its operations as an Air Force Base, Olmsted grew to quite an expansive installation which had 11,400 civilian employees. In 1969, Olmsted Air Force Base was decommissioned, but retained some military operational functions, primarily associated with the Pennsylvania Air National Guard, which functions continue to this day.

Upon decommissioning, the premises were converted into a civilian airport facility, renamed HIA, and were primarily the property and responsibility of the Com-

monwealth of Pennsylvania, Department of Transportation. In 1998, PennDOT ceded ownership of HIA to a newly formed municipal entity, known as the Susquehanna Area Regional Airport Authority, which is comprised of the representative governmental entities of Cumberland, Dauphin and York counties, the cities of Harrisburg and York, and the townships of Fairview and Lower Swatara. It is essentially SARAA that now owns and operates HIA as a joint municipal endeavor.

The primary nature of the issue(s) before this court is SARAA's proposed management of and/or limitation upon the common carrier taxi services which operate within the greater Harrisburg Region, and by direct implication, provide those same common carrier services to HIA. There are three such taxi services which primarily serve HIA, namely, American Taxi Company, Keystone Taxi, and the plaintiff, Capital City Cab.

Given the fact that SARAA owns and operates HIA, it (SARAA) appears to presume that it should arrange for taxi services, and particularly the control of outbound taxi fares and services, for airport patrons. However, in this Commonwealth, taxi service providers are deemed to be public utilities because they are common carriers. See 66 Pa.C.S. §102. A common carrier is generally defined as: "[a]ny and all persons or corporations holding out, offering, or undertaking, directly or indirectly, service for compensation to the public for the transportation of passengers or property, or both, or any class of passengers or property, between points within this Commonwealth by, through, over, above, or under land, water, or air, and shall include forwarders, but shall not include contract carriers by motor vehicles, or brokers, or any bona fide cooperative association transporting prop-

erty exclusively for the members of such association on a nonprofit basis." 66 Pa.C.S. §102.

Pennsylvania statute, more specifically defines common carrier by motor vehicle as: "[a]ny common carrier who or which holds out or undertakes the transportation of passengers or property, or both, or any class of passengers or property, between points within this Commonwealth by motor vehicle for compensation, whether or not the owner or operator of such motor vehicle, or who or which provides or furnishes any motor vehicle, with or without driver, for transportation or for use in transportation of persons or property as aforesaid, and shall include common carriers by rail, water, or air, and express or forwarding public utilities insofar as such common carriers or such public utilities are engaged in such motor vehicle operations. . . ." 66 Pa.C.S. §102.

Primary authority over public utilities lies within the PUC. Pursuant to Pennsylvania statutory enactment, the General Assembly has provided:

"(b) Administrative Authority and Regulations.—The commission shall have general administrative power and authority to supervise and regulate all public utilities doing business within this Commonwealth. The commission may make such regulations, not inconsistent with law, as may be necessary or proper in the exercise of its powers or for the performance of its duties." 66 Pa.C.S. §501(b).

As such, the PUC has the primary authority to regulate and administer taxi service providers.

So as to fully illuminate the issues at hand, it is important to discuss the events leading up to the filing of the petition which brought this case before this court. On

June 30, 2003, in an attempt to have the PUC abandon and/or abrogate some of its primary statutory and regulatory authority over taxi services providers at HIA, SARAA filed a "petition for declaratory order" with the PUC. From the express averments in that initial declaratory petition before the PUC, it is clear that SARAA, at the very least, acknowledged that the PUC had primary jurisdiction over outbound taxi service providers. Through that declaratory petition, SARAA requested that the PUC give it (SARAA) control over outbound taxi fares from HIA. SARAA wanted such control so that it was free to enter into an agreement with only one of the taxi cab companies which provided service to HIA, namely, American Taxi. Such a request was alleged by SARAA to be necessary because of constant difficulty that it (SARAA) was having with providing adequate taxi services at HIA. As such, SARAA requested that the fares originating at HIA (outbound fares) would not be subject to the PUC's regulatory authority. SARAA averred in the declaratory petition that such outbound control by SARAA was necessary because it was both legally permissible and more efficient for the PUC to not exercise its primary jurisdiction over the taxi company which would provide exclusive outbound transportation at HIA through an anticipated contract with SARAA. (Petition for declaratory order, June 30, 2003.)

On January 16, 2004, the PUC held a public meeting to address the relief requested by SARAA in the declaratory petition. After a public meeting on that matter, the PUC denied SARAA's request on January 20, 2004, and issued a formal order establishing its decision, wherein it (PUC) set forth its basis and holding on such matters. SARAA never filed an appeal to that formal order, al-

though such formal order constituted a decision that could have been properly presented to the Commonwealth Court on appeal. As such, that PUC decision stands as essentially the present law of the case, unless and until it is otherwise amended by further proceedings before the PUC or by a court of competent jurisdiction on appeal.

Even though SARAA never challenged the PUC's decision by a proper appeal, it (SARAA) then went forward and completely disregarded that PUC decision and awarded an exclusive contract to American Taxi for taxi services, including outbound taxi services, at HIA. By awarding an exclusive contract to American Taxi on May 26, 2004, a monopoly of sorts occurred because only one taxi service provider could take outbound fares from HIA pursuant to that contract. In doing that, SARAA collaterally and additionally took away the consumer's right to not only choose an outbound taxi service provider, but to also not have the possible consumer benefit that competitive multiple taxi service providers might yield.

We must note that at the same time that SARAA was attempting to regulate taxicab services at HIA, it (SARAA) was involved with a multi-million dollar renovation project, wherein it was upgrading the HIA terminal and general airport facilities. As a result, a substantial upgrade and enlargement of HIA was occurring, which one might presume was intended to increase the number of arriving and departing passengers at HIA, with its probable concomitant increase in the need for taxi services. SARAA has not disclosed to the court, to date, what type(s) of remuneration and/or other benefit(s) it (SARAA) intended to derive from letting an exclusive outbound contract for taxi services. Those matters will

presumably be flushed out in the forthcoming proceedings before the PUC.

Once SARAA disregarded the PUC's formal order by offering an exclusive contract to American Taxi, Capital City Cab filed a "petition for a preliminary injunction" and a "declaratory judgment complaint and petition for preliminary and permanent injunctions," on June 1, 2004, with this court. In light of that filing, this court scheduled the aforementioned pre-hearing conference. Prior to the conference, Capital City Cab filed an "amended petition for preliminary injunction" and an "amended declaratory judgment complaint and amended petition for preliminary and permanent injunctions." SARAA filed an answer to the amended petition for preliminary injunction and preliminary objections to the amended declaratory judgment complaint. As mentioned earlier, on June 9, 2004 (the day before the evidentiary hearing on the petition), this court held the pre-hearing conference. Throughout the course of that conference, the main issue raised by SARAA was that Capital City Cab was not able to post the vehicle liability insurance mandated by SARAA, but apparently not mandated by the PUC.[1]

---

1. We must note that the current minimum insurance required by the PUC certainly does not appear to be in keeping with any kind of modern concept of liability coverage for common carriers, especially considering the strict liability to which such carriers are subjected with regard to their passengers, and possibly others. Pursuant to 66 Pa.C.S. §512, the PUC may order that:

"All motor carriers of passengers, whose current liquid assets do not exceed their current liabilities by at least $100,000, shall cover each and every vehicle, transporting such passengers, with a public liability insurance policy or a surety bond issued by an insurance carrier or a bonding company authorized to do business in this Commonwealth, in such amounts as the commission may prescribe, but not less

In fact, it was on April 1, 2004, that Capital City Cab was notified by SARAA that it (Capital City Cab) was no longer approved for outbound taxi service at HIA because of Capital City Cab's failure to maintain $1,500,000 of liability insurance for its taxicabs. As a result of said notification, Capital City Cab filed a petition for emergency relief by issuance of a temporary order with the PUC requesting that the PUC issue a temporary order which allows Capital City Cab to continue providing outbound taxi service at HIA. The PUC, via a letter, denied the relief requested because a clear and present danger was not deemed to exist at that time, and therefore an ex parte emergency order was not viewed

than $5,000 for one and $10,000 for more than one person injured in any one accident." 66 Pa.C.S. §512.

The PUC was granted exclusive regulatory power to mandate insurance requirements by the legislature on July 31, 1987 and said requirements were amended, most recently, on July 7, 2000. Those insurance requirements can be found in 52 Pa.Code §32.11. What the Pennsylvania Code requires is that insurance maintained by a common carrier: "shall be in an amount not less than $35,000 to cover liability for bodily injury, death or property damage incurred in an accident arising from authorized service. The $35,000 minimum coverage is split coverage in the amounts of $15,000 bodily injury per person, $30,000 bodily injury per accident and $5,000 property damage per accident. This coverage shall include first-party medical benefits in the amount of $25,000 and first-party wage loss benefits in the amount $10,000 for passengers and pedestrians. 52 Pa.Code §32.11(b)."

This court was rather startled that in the year 2004, the PUC would continue to permit such relatively insignificant sums of insurance in light of the potential liability associated with taxicab service with routes at the airport or taxicab routes, generally. As a general proposition, the monetary amount of $1,500,000 which was attempted to be imposed by SARAA was not unreasonable; however, the establishment of a minimum amount appears to be within the exclusive jurisdiction of the PUC and as set forth by statute.

by the PUC to be warranted. (See PUC letter, 5/7/04.) However, the PUC did inform Capital City Cab that it could pursue this claim via a formal complaint to the commission. *Id.* On May 18, 2004, a complaint was filed with the PUC by Capital City Cab. Disposition of that matter is presently pending and imminent before the PUC.

This court clearly realizes that under the Municipal Authorities Act (MAA), SARAA has certain powers to make determinations with regard to the services and improvements at the airport. 53 Pa.C.S. §5607. We do not believe that such power extends as far as declaring mandatory insurance requirements for taxi cabs that are merely pulling to the curbside to drop off fares. We find that to be especially true, given the fact that there are clearly statutory and regulatory enactments in existence regarding the scope and amounts of such insurance for taxi companies which firmly vest exclusive jurisdiction of such matters within the determination of the PUC. This court found that SARAA was quite probably usurping the PUC's power through its (SARAA's) requirement of $1,500,000 of insurance coverage per occurrence, even though the PUC had not ever established such an amount for taxi cab service providers.

As a result of not being able to resolve the issue(s) in dispute at the conference, an evidentiary hearing was held on June 10, 2004. At that hearing, it was patently clear to this court that SARAA and Capital City Cab could agree on just about every issue, except one, insurance coverage. Capital City Cab believed that it should be allowed to continue picking up spontaneous fares at HIA because, in light of the PUC's January 20, 2004 order, SARAA was not acting within its authority when it awarded American Taxi an exclusive contract. SARAA, on the

other hand, believed that it was acting within its authority when it entered into the contract with American Taxi, even though it (SARRA) had already acknowledged that the primary jurisdiction over the determination of such matters was vested in the PUC by the General Assembly.

It is important for us to note that SARAA was amenable to Capital City Cab picking up pre-arranged fares at HIA. However, SARAA was equally opposed to Capital City Cab picking up spontaneous fares at curbside. In fact, at the conclusion of the hearing, this court directed that both parties submit proposed orders for the court's consideration. In SARAA's proposed order, its main point of contention was that it did not believe that this court could allow a cab to remain at the curbside for up to one minute after a drop-off. SARAA vaguely claimed that this was precluded by federal law. However, SARAA never adduced any credible evidence at the hearing in support of that contention. As such, in its proposed order, SARAA requested immediate departure by Capital City Cab without any opportunity of securing a spontaneous outbound fare. SARAA also requested that our interim decree only apply to the parties involved. The only true difference in our interim decree and SARAA's proposed order was the fact that we allowed Capital City Cab to remain at the curbside for up to one minute after drop-off. On balance, we viewed SARAA's position to be unreasonable in light of the practical necessity for the cab driver to safely stop the arriving cab at the terminal curbside, for the cab driver and the passenger(s) to alight from the cab, for the driver to place the passenger's luggage on the curb, receive payment for the fare, walk back to the driver's door, open the door, reenter the cab, fas-

ten a seat belt, start the vehicle, put the vehicle into gear, check for existing nearby traffic, and pull safely away from the curb. It should be specifically noted that we allowed UP TO ONE MINUTE for these usual functions to be concluded, and we also equally admonished the plaintiff's employees (cab drivers) not to attempt to solicit an outbound fare or otherwise dally at the curbside to see if an outbound fare would somehow develop. The only exception to the foregoing restriction was the occurrence of a true spontaneous fare as we clearly outlined in our interim decree. Indeed, it was obvious to us that in the normal course of arrivals and departures at the curbside at HIA, it was very likely that regular private vehicles would likely exceed that one-minute time limitation, and, therefore, a Capital City Cab driver should not be treated any differently.

As a result of a full and careful consideration of all the information provided to this court, we issued an interim decree wherein we returned Capital City Cab to the status quo, ante, that had existed prior to the unilateral actions of SARAA, all pending the PUC's ultimate disposition of this issue.[2] A court of common pleas should not itself usurp the clear mandate of the General Assembly which vests primary jurisdiction of these matters in a governmental agency. However, we can and should exercise our equity power, but only to the degree minimally necessary under all of the circumstances, to restore the status quo, and allow the administrative law functions of the government to operate. Had we not allowed Capital City Cab the opportunity to revert to the status quo pend-

---

2. This case is scheduled to be heard by the PUC on November 19, 2004.

ing such resolution by the PUC, it (Capital City Cab) would have likely faced irreparable harm[3] to its business interests.

## ISSUES

In the instant appeal, SARAA raises the following issues before the Commonwealth Court:

"(a) Whether the court erred, as a matter of law, in refusing to grant SARAA's preliminary objections to the complaint filed on behalf of Capital City Cab Service Inc. where, as here, the Commonwealth of Pennsylvania, Public Utility Commission has exclusive jurisdiction over the issues set forth in the pleadings in this matter and the order has the potential to set statewide precedent in airport operation. . . .

"(b) Whether the court erred, as a matter of law, in awarding interim equitable relief authorizing Capital City to provide outbound taxi service at Harrisburg International Airport despite SARAA's termination of its contract with Capital City and issuance of directive prohibiting Capital City from providing services on property owned by SARAA as authorized by the Municipal Authorities Act, 53 Pa.C.S. §5601 et seq. . . .

"(c) Whether the court erred, as a matter of law, in awarding interim, equitable relief authorizing Capital City to provide outbound taxi service at HIA despite the fact that SARAA properly and reasonably exercised its discretion—as provided in the MAA and Pennsylvania Public Utility Code, 66 Pa.C.S. §101 et seq.—to solicit

---

3. The standard set forth for granting a preliminary injunction will be discussed later in this writing.

bids lawfully and properly award a contract for exclusive outbound taxi service. . . .

"(d) Whether the court erred, as a matter of law, in awarding interim equitable relief compelling SARAA to allow taxi operations at HIA in a manner inconsistent with the policies promulgated pursuant to its statutory authority under the MAA, which policies were developed in accordance with safety and security mandates established by the Aviation and Transportation Security Act, 49 U.S.C. §40101 et seq., enforced by the Transportation Security Administration, and the Homeland Security Act, 6 U.S.C. §1101 et seq. . . ."

## DISCUSSION

Before we begin addressing the issues raised in this instant appeal, we will first address the standard utilized in this Commonwealth when determining whether or not a preliminary injunction should be granted, in whole or in part: "a court may grant a preliminary injunction only where the moving party establishes the following elements: (1) that relief is necessary to prevent immediate and irreparable harm which cannot be compensated by damages; (2) that greater injury will occur from refusing the injunction than from granting it; (3) that the injunction will restore the parties to the status quo as it existed immediately before the alleged wrongful conduct; (4) that the alleged wrong is manifest, and the injunction is reasonably suited to abate it; and (5) that the plaintiff's right to relief is clear. . . . it is of course necessary that the moving party be able to show that he has a reasonable likelihood of success on the merits." *Lewis v. City of Harrisburg,* 158 Pa. Commw. 318, 631 A.2d 807, 810

(1993) (internal citation omitted); *Riverside School Board v. Kobeski,* 146 Pa. Commw. 106, 604 A.2d 1173 (1992).

It was clear to this court that is was necessary for us to exercise a limited amount of our equity power because, if we failed to do so, Capital City Cab would likely have suffered the irreparable harm of being put out of business by the actions of SARAA, which actions appear to be unlawful. Further, we believed that SARAA would not suffer any real injury from the issuance of our limited interim decree, especially since the PUC was prepared to move forward to hear and resolve the matter. Additionally, given the prior ruling of the PUC, which was not appealed by SARAA, it was quite apparent that the plaintiff had a right to interim relief in order to allow the PUC a sufficient opportunity to make its determination on the merits of the case. In the final analysis, all that our interim decree was meant to do was to return the parties to the status quo, ante, pending a resolution of this matter by the PUC.

With regard to the issues raised in this appeal, SARAA first asserts that this court erred in issuing our interim decree because we do not have jurisdiction over this matter. From SARAA's perspective, that premise appears to be based on the principle that rates and practices regarding deposits are within the exclusive jurisdiction of the PUC. See *Morrow v. Bell Telephone Co. of Pennsylvania,* 330 Pa. Super. 276, 280, 479 A.2d 548, 551 (1984). Further, SARAA asserts that it is within the PUC's authority to rule on an agreement's validity. See *Octoraro Railway Inc. v. Pennsylvania Public Utility Commission,* 85 Pa. Commw. 283, 287-88, 482 A.2d 278, 279 (1984). We will certainly agree with SARAA's

initial contention that the PUC has primary jurisdiction over the core issues in dispute, and it is for that very reason that we deferred exercising our equity jurisdiction any further than restoring the status quo, ante, and remanding the matter to the PUC for a full hearing and adjudication.

What SARAA seems to forget was that this court was not asked to rule on a validity of an agreement, nor were we asked to make a decision on a "service practice," we were simply asked to preliminarily allow Capital City Cab to continue its outbound taxicab service at HIA pending a full hearing on this matter before the PUC. That request appears to be within this court's jurisdiction because, as Capital City Cab stated, "[a]lthough the public utility law grants to the commission general supervisory and regulatory power over public utilities, . . . the code does not confer an exclusive jurisdiction to decide all matters involving regulated public utilities. On the contrary, except as otherwise expressly provided in the code, the commission's powers and duties do not 'abridge or alter the existing rights of action or remedies in equity or under common or statutory law of this Commonwealth.' " *Virgilli v. Southwestern Pennsylvania Water Authority,* 58 Pa. Commw. 340, 343, 427 A.2d 1251, 1253 (1981). (citations omitted)

As such, all that this court did was act within our jurisdiction in our interim decree when we returned things to the status quo, pending a resolution of this matter with the PUC.

With regard to SARAA's second contention that this court erred when we allowed Capital City Cab to continue to provide outbound taxi services at HIA after

SARAA issued its directive prohibiting such action, we strongly disagree.

Again, we must unequivocally state that SARAA clearly acknowledged that the primary and exclusive jurisdiction of regulating taxi services in this Commonwealth lies in the hands of the PUC. SARAA made that acknowledgment when it (SARAA) requested that the PUC give SARAA that very authority to regulate taxicab service at HIA. The PUC denied the request in their January 20, 2004 formal order, and SARAA failed to appeal that decision. As such, as we also mentioned earlier, the January 20, 2004 order is the present law of this case. In light of that salient fact, this court finds the law cited by SARAA in support of its statement of matters complained of on appeal to be unpersuasive on that issue and on the remaining issues also raised in the statement of matters complained of on appeal. Indeed, SARAA is now essentially estopped from arguing to the contrary of that proposition.

Since the PUC did not grant SARAA's request, this court believes that we were correct in returning Capital City Cab to the status quo until the PUC determines whether or not SARAA was correct in awarding an exclusive contract to American Taxi. As such, we do not believe that we erred in making our temporary determination to allow the PUC an opportunity to fulfill its statutory mandate.

SARAA next asserts that this court erred when we allowed Capital City Cab to provide outbound taxi service at HIA. We do not believe that SARAA truly understands the limitations of our interim decree, because we are not allowing Capital City Cab to provide full outbound taxi

service, which would involve Capital City Cab utilizing the Q-line.

First and foremost, the petition at no time asked that this court permit Capital City Cab to be one of the cabs that line up in the cab queuing line (Q-line) for potential outbound fares. The Q-line at HIA is where outbound taxicab service providers line up to be sequentially summoned to the curbside to pick up passengers who are departing the airport. The Q-line is a separate and private parking area which is, indeed, under the exclusive control of SARAA. During both the pre-hearing conference and the hearing, it was expressly understood that Capital City Cab was not asking for, nor was this court allowing them, to line up at the Q-line. Further, our interim decree, at no time, makes reference to Capital City Cab being allowed to line up in the Q-line. What our interim decree expressly states is that:

*"Pursuant to its authorization from the PUC,* Capital City Cab shall have the right to pick up pre-arranged fares from HIA in accordance with the following terms and conditions. Capital City Cab may pick up the pre-arranged passenger at HIA's terminal's curbside provided that the passenger is ready and willing for immediate loading (which means that the passenger is waiting at the curbside with his/her bags). In that case, Capital City Cab employee may pick up the passenger, together with his/her luggage (if any) and immediately depart the terminal area. However, if the pre-arranged passenger is not at the curbside waiting, Capital City Cab employee shall immediately proceed to HIA's short-term parking facility and return to the terminal by foot, in order to

wait for the pre-arranged passenger. Upon the arrival of the pre-arranged passenger, Capital City Cab employee and such passenger must then proceed to the short-term parking area where loading, followed by immediate departure, shall occur.

"*Pursuant to its authorization from the PUC,* in the event that a cab operated by Capital City Cab disembarks an arriving passenger at the curbside, as aforesaid, and should there be another outbound fare that coincidently and simultaneously appears at the curbside and wishes to engage the services of said Capital City Cab vehicle, the employee of Capital City Cab shall be permitted to receive that fare, and his/her personal luggage (if any) for outbound departure from the HIA facility. However, no Capital City Cab employee shall linger or otherwise delay in departing the premises of the HIA facility in hopes of possibly securing an outbound fare or otherwise, and once the arriving passenger and his/her luggage have been deposited at the curbside, Capital City Cab employee shall depart the curbside area within one minute, unless a bona fide simultaneous outbound fare is encountered, as set forth in paragraph no. 2 above." Interim decree, June 14, 2004, ¶¶ 2-3. (emphasis added)

As referenced above, the terms of this court's interim decree expressly state that, *pursuant to the PUC's authorization,* Capital City Cab may pick up the pre-arranged fares, in accordance with the above referenced condition or drop passengers off at HIA. (See also, interim decree, June 14, 2004, ¶ 2.) SARAA does not appear to have an issue with that concept. What SARAA has an issue with is the fact that this court allowed Capi-

tal City Cab to drop passengers off and if, within one minute of that time wherein the passenger is being dropped off, (so essentially simultaneous to the drop-off) an outbound fare is encountered at curbside, Capital City Cab would be allowed to pick up said fare. Had we not allowed this one-minute period of time to disembark the arriving passenger(s) and their luggage, as discussed earlier, the passenger(s) would essentially have to grab his/her luggage, pay the fare, and disembark the vehicle while the vehicle was still coming to a stop at the curbside. That concept appears to be absolutely unreasonable.

With all that in mind, we will address SARAA's next contention, wherein it asserts that this court erred, as a matter of law, because we allowed taxi operations to occur at HIA which were inconsistent with the policies promulgated under MAA and violated the Homeland Securities Act.

Through those assertions, SARAA is doing nothing more than attempting to divert attention away from the fact that it does not want Capital City Cab to get spontaneous fares from HIA customers because it (SARAA) has "chosen" American Taxi to receive those fares. Not once did SARAA point to a specific section of any statute or code which directly supports its assertions. Moreover, we must again point out that this court allowed Capital City Cab to remain at the curb for only one minute, thus giving the departing passenger(s) a chance to disembark the taxi vehicle in a manner that is accommodating to the passenger(s). Additionally, there was never any kind of an assertion by SARAA that it inspects, searches or otherwise regulates any other taxi company

vehicle or other curbside-arriving vehicle for nefarious items or other potential dangers. The attempt to invoke those federal statutes is nothing more than the proverbial "red herring" designed to obscure and deflect SARAA's true intentions, and a rather infirm attempt to justify its seemingly unlawful conduct. We were not persuaded at the hearing of the viability of such claims, and that assertion has not gained more credibility over the course of time. Indeed, to paraphrase a time-worn cliché on that assertion, we find that "a ruse by any other name is still a ruse."

For the reasons mentioned above, we believe that our interim decree should be upheld pending the PUC's further disposition of this matter.

ORIGINALLY ISSUED AT HARRISBURG, November 8, 2004.